UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

IN RE:

  JOHN and KAREN SPRINGBERG,

    Debtors.

_____/

GRAND VALLEY LIMITED PARTNERSHIP,

  Plaintiff,

v.

JOHN and KAREN SPRINGBERG,

  Defendants.

_____/

Case No: 12-09553-jrh
Chapter 7 Proceeding
Hon. Daniel S. Opperman

Adversary Pro. No. 13-80019-jrh

OPINION AND ORDER AFTER TRIAL

PRESENT:  HONORABLE DANIEL S. OPPERMAN
     United States Bankruptcy Judge

INTRODUCTION

John and Karen Springberg (the "Defendants") filed a voluntary petition for bankruptcy relief under Chapter 7 on October 30, 2012. On January 28, 2013, Grand Valley Limited Partnership (the "Plaintiff") timely filed an adversary proceeding objecting to the discharge of its claim against the Defendants based upon its allegations that the Defendants incurred the debt using false representations in written statements respecting their financial condition under 11 U.S.C. § 523(a)(2)(B)[1] and seeking a judgment for damages, plus costs and attorney fees. The parties agree this case turns on whether the Plaintiff reasonably relied on the Defendants' statements and whether the Defendants intended to deceive the Plaintiff.

---

[1] The Plaintiff originally plead, in the alternative, that the debt was also non-dischargeable under 11 U.S.C. § 523(a)(2)(A). Complaint (DN 1). Based upon the Plaintiff's Pretrial Statement (DN 23), the Court narrowed the issues for trial to only non-dischargeability under 11 U.S.C. § 523(a)(2)(B). *See* First Pretrial Order (DN 26).

1

The Court conducted a trial on May 14, 2014, in Traverse City, Michigan.  It has carefully considered the Plaintiff's Exhibits 1 through 10 and the Defendants' Exhibits B through D, F, G, and N, which were all admitted by the Court.  The Court listened to the credible testimony of Defendant, John Springberg ("Mr. Springberg"), Plaintiff's principal and CEO, John Mann ("Mr. Mann"), and Wade Van Houzen ("Mr. Van Houzen").  Over the Defendants' objection, the Court qualified Mr. Van Houzen as an expert in bank commercial lending under Federal Rules of Evidence 702 and 703.  The Court also reviewed the parties' Stipulated Facts (DN 59) and written Closing Arguments (DNs 61 and 62).  For the reasons stated in this Opinion, the Plaintiff's request to except the debt from discharge under 11 U.S.C. § 523(a)(2)(B) is denied.

JURISDICTION

The Court has jurisdiction over the Defendants' Chapter 7 case pursuant to 28 U.S.C. § 1334(a). That case and this adversary proceeding have been referred to this Court by the United States District Court pursuant to 28 U.S.C. § 157(a) and LCivR 83.2(a) (W.D. Mich.). This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of particular debts).

The issues in this matter arise from Title 11 of the United States Code and do not involve any matter which limits this Court's jurisdiction as detailed by the United States Supreme Court in *Stern v. Marshall*, ---- U.S. ----, 131 S. Ct. 2594, 2608, 180 L.Ed.2d 475 (2011), and later by the United States Supreme Court in *Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165 (2014).  *See also Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012).

## FINDINGS OF FACT

The parties stipulated to the following facts:

The Plaintiff sold a Hampton Inn hotel in Cadillac, Michigan to the Defendant, John Springberg. John and James Mann are the Plaintiff's sole general partners and decision makers. They are brothers. For approximately the last 20 years, the Mann brothers have been engaged in the business of constructing, managing, and operating hotel properties, and currently hold interests in and/or manage and operate approximately 24 hotel properties in the Upper Midwest and Florida.

In connection with those hotel business operations, John Mann has participated in over 50 loan transactions. John Mann was an attorney in private practice in Illinois for 25 years, focusing on real estate work and representing borrowers in over 100 lending transactions. By necessity, Mr. Mann's law practice experience includes substantial experience with personal financial statements.

Initially, the Plaintiff entered into a purchase and sale agreement to sell the Hampton Inn hotel in Cadillac, Michigan and all associated real and personal property to the Defendants for a purchase price of $4,500,000. At the time the purchase agreement was negotiated and executed, the Plaintiff and the Defendants were competitors in the hotel market in Cadillac, Michigan, as Mr. Springberg was a principal owner of the Holiday Inn Express hotel also located in Cadillac, Michigan. When the purchase agreement was signed, the Manns and the Springbergs did not know each other personally, were not acquaintances or friends, and had never done business together.

The original purchase agreement provided that closing would occur on or before March 20, 2006, and that the full purchase price, less a small earnest money deposit, would be paid in

3

immediately available funds at closing.   There was no seller financial component to this transaction.

The closing did not occur by the March, 2006, closing deadline because Mr. Springberg was unable to obtain sufficient financing to cover the entire purchase price.   To complete the deal, the Plaintiff agreed to add a seller financing component to this transaction to cover the remainder of the purchase price that would not be covered by the Defendants' bank and other financing.

The Plaintiff required a financial statement from the Defendants in connection with the seller financing proposal.   On July 20, 2006, the Defendants' daughter, Julie Snyder, faxed to John Mann a copy of a personal financial statement executed on May 1, 2006, that had been submitted to Republic Bank, the Defendants' primary lender in the Hampton Inn transaction. Mr. Mann has no recollection of reviewing the document more than once, and did not verify, confirm, or follow up on any of the information contained in the 2006 personal financial statement.   Moreover, Mr. Mann has no recollection of ever talking to Mr. Springberg about the personal financial statement.   The personal financial statement showed a net worth of over $6,000,000 and close to $7,000,000 with comparatively minimal liability of $305,000.

On or about July 25, 2006, the Plaintiff and the Defendants executed a first amendment to the Hampton Inn purchase agreement, which, among other terms, included a reduction of the purchase price to $4,100,000 and a provision providing that the Plaintiff would loan $675,000 to the Defendants in exchange for two separate promissory notes - - one for $400,000 and one for $275,000.   The loan was structured this way because the Defendants were close to completing construction on a new home, and, after completion, a separate bank loan could be finalized that would result in a $275,000 payment to the Plaintiff with the remaining seller finance note to be repaid at a later time.

The Hampton Inn purchase transaction closed on or about August 17, 2006.  The $275,000 note was timely repaid shortly after the closing.  The Defendants, however, defaulted on the $400,000 note, and the Plaintiff brought a collection action against the Defendants.  On October 30, 2009, a default judgment in the amount of $507,621.77 was entered against the Defendants.

As a result of the testimony at trial and the admitted Exhibits, the Court makes these additional findings of fact.

Mr. Springberg was initially involved in the soft drink business and owned a distributorship of those beverages.  He ultimately sold his distributorship and then was a musician for approximately 20 years.  During these years, Mr. Springberg began buying and remodeling houses for rental and he eventually expanded into developing recreational properties, such as miniature golf courses and amusement parks.  Starting in 1990, he operated hotels, primarily Days Inn or Holiday Inn hotels in the Cadillac and Ludington areas of Michigan.  As stated in the Stipulated Facts, Mr. Springberg agreed to buy the Plaintiff's Hampton Inn in Cadillac, Michigan.  As part of this transaction, he directed his accountant, Nancy Bowman, to prepare a Personal Financial Statement ("Statement"), admitted as Exhibit 1.  Mr. Springberg testified that he assigned Ms. Bowman this task because she prepared the tax returns for him and his entities.  He did not give Ms. Bowman much input to prepare this Statement, and he did not devote much time to reviewing her work.  Regardless, both he and Karen Springberg signed this Statement.  Directly above each signature is the following language: "Agreement with these Representations and Warranties, and, attesting to the accuracy of information provided on this form and all attachments."

Directly above this sentence is the following relevant language: "The undersigned acknowledge and understand that you are relying on the information provided herein in deciding

to grant or continue credit or to accept a guarantee thereof.  Each of the undersigned represents, warrants, and certifies that the information provided here is true, correct and complete."

As part of the introductory portion of the Statement, the following questions and answers appeared:

 "Are you a guarantor, co-maker, or endorser for any debt of an individual, corporation, or partnership?   No."

The Statement contained the following:

| ASSETS | APPLICANT | CO-APPLICANT/SPOUSE | JOINT |
|---|---|---|---|
| Net Cash Surrender Value of Life Insurance (Schedule B) | | | $500,000 |
| Partnerships/PC Interests (Schedule D) | | | $4,999,000 |

Schedule B – Insurance
Life Insurance (use additional sheet if necessary)

| Insurance Company | Face Amount of Policy | Type of Policy | Named Insured | Beneficiary | Cash Surrender Value | Amount Borrowed | Policy Owner |
|---|---|---|---|---|---|---|---|
| Jackson National | $50,000 | | John | Karen | $500,000 | | John |

Schedule C – Personal Residence & Real Estate Investments, Mortgage Debt

| Personal Residence Property Address | Legal Owner | Percent Owned | Purchase year and Price | Market Value | Present Loan Balance | Interest Rate | Loan Maturity Date | Monthly Payment | Lender |
|---|---|---|---|---|---|---|---|---|---|
| 2230 So 45 ½ Rd, Cadillac, MI | John & Karen | 100% | 1980 $67k | $257,000 | $25,000 | 5.20% | 0 | $661 | Chemical |
| 17321 52 Road | John & Karen | 100% | 1987 $35k | $1,190,000 | $250,000 | 5.80% | 0 | $1,250 | Honor State |

Schedule D – Partnerships

| Type of Investment | Date of Initial Investment | Cost | Percent Owned | Current Market Value | Balance Due on Partnership: Notes, Cash Call | Final Contribution Date |
|---|---|---|---|---|---|---|
| Business/Profession | | | | | | |
| Springberg Inc. | 1/1/1981 | | 100.00% | $55,000 | | |
| Adventure Island | 1/1/1987 | | 50.00% | $550,000 | | |
| | | | | | | |
| Luddington Lodging | 1/1/1993 | | 50.00% | $850,000 | | |
| AJJ Real Estate | 1/1/2002 | | 100.00% | $1,825,000 | | |
| J&K Real estate | 1/1/2000 | | 100.00% | $1,164,000 | | |

** Note:  For investments which represent a material portion of your total assets, please include the relevant financial statements or tax returns, or in the case of partnership investments or S-corporation, schedule K-1's.

At trial, Mr. Springberg said he knew he was a guarantor of an obligation regarding the Holiday Inn Express operated by a limited liability company owned in part by him, but that he construed this question to address only debts not related to his own business interests.

As for the insurance policy disclosures, Mr. Springberg thought the cash surrender value meant the amount received on his death, commonly called the death benefit.  He was not aware of any actual cash value for this policy.

Page 2 of Exhibit 1 listed the value of all the partnership interests of the Defendants as $4,999,000.  It is unclear how this $4,999,000 total was reached. Adding together the current market value amounts for each partnership leads to a total of $4,444,000.  Adding together the Defendant's interest in the current market value amounts provided leads to a total of $3,744,000. Likewise, it is unclear whether the current market value provided for each partnership is the total value, or the value of the Defendant's interest.  For example, Mr. Springberg testified that the Adventure Island partnership, which was valued at $550,000 on the Statement, had an actual value to the Defendants of $275,000, or 50% of $550,000.  Moreover, Mr. Springberg agreed with the total value of $1,100,000 because he talked to his partner, Mr. Loren Campbell, and they agreed the property had that value.  Neither gentleman had an appraisal for this property.

7

Likewise, Mr. Springberg valued the Ludington Lodging property based on his discussions with his partner, Mr. Campbell. Mr. Springberg testified that the Ludington Lodging property had been appraised for $2,100,000 in 2000 or 2001. Mr. Springberg and Mr. Campbell also had a purchase agreement in 2000 in the amount of $3,000,000 for the Ludington Lodging and Adventure Island properties. This transaction was not completed because the buyer could not obtain financing. Mr. Springberg subsequently surrendered his interest in this property to Mr. Rensberry. Mr. Springberg thought this surrender was in full satisfaction of his debts to Mr. Rensberry. Per Mr. Springberg, Mr. Rensberry disagrees with this conclusion.

Mr. Springberg based the value of the AJJ Real Estate, which owned the Cadillac Holiday Inn Express, on an appraisal valuing this property at $4,200,000, less approximately $2,200,000 of secured debt. This secured debt appears to be $2,600,000 from the Defendants' records, but Mr. Springberg explained this discrepancy as resulting from the reorganization he was doing with his companies.

The value of J&K Real Estate was set by Mr. Springberg by comparing nearby property and property north of Cadillac and then determining a value of $1,164,000. In contrast, Exhibit 5, an appraisal dated as of June 1, 2006, places the value of this property at $820,000. Per Mr. Springberg, there was a secured debt of $420,000 on this property, which he did not completely consider in his statement of value for J&K Real Estate.

Finally, Mr. Springberg testified that he did not report any income on the Statement because he never drew a salary and he had not paid income taxes for years.

In addition to the Stipulated Facts, Mr. Mann's testimony centered on his review of the Statement. Mr. Mann testified that he was anxious to close this transaction, so the payment of renovations to the Hampton Inn could be avoided. When he learned that Republic Bank would not fully finance the sale, he agreed to provide limited seller financing, but required that the

Defendants give him a copy of the Statement.  He admitted that he looked at the Statement quickly and did not delve into the details of the Statement.  Instead, he relied on Republic Bank's review of the Statement, coupled with his confirmation that the Defendants had equity in their property.  Mr. Mann testified that he was not concerned about the Defendants' lack of income. He did, however, note the values stated for life insurance because he viewed the policies as a possible liquid asset.  He did note that a large cash value life insurance policy would be somewhat unusual, but he did not note the inconsistency between the face amount of $50,000 and the cash surrender amount of $500,000.

The Defendants called Wade Van Houzen as an expert witness regarding financial statements.  As a business banking manager of 24 years, Mr. Van Houzen has reviewed numerous financial statements and is aware of certain red flags that needed closer attention.  In particular, the lack of income, the failure to check a box indicating the Defendants were guarantors, and the error in the life insurance disclosure were all signs that Mr. Van Houzen opined would require the Plaintiff to look closer into the Defendants' financial affairs.

By agreement of the parties, Karen Springberg did not testify because her testimony would not be different from her husband, John Springberg.

APPLICABLE AUTHORITIES

A.  Section 523(a)(2).

Under section 727 of the Bankruptcy Code, a debtor may obtain a general discharge from all debts that arose before the order for relief.  11 U.S.C. § 727(b).  However, there are exceptions for certain obligations, including debts for money obtained by use of a false statement in writing.  11 U.S.C. § 523(a)(2)(B) provides:

> (a) A discharge under section 727 . . .  does not discharge an individual debtor from any debt –
>
>> (2) for money, property,  services, or an extension, renewal, or refinancing of credit, to the extent obtained by –

9

. . .

(B) use of a statement in writing –

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

The purpose of Section 523(a)(2) is to prevent debtors from retaining the benefits of property obtained through fraud. *In re Omegas Group, Inc.,* 16 F.3d 1443, 1451 (6th Cir. 1994). The plaintiff must show each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286 (1991). Even so, the Court must construe all of the exceptions to discharge strictly, and must give the benefit of the doubt to debtor. *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998).

To prevail on a § 523(a)(2)(B) claim, a plaintiff must establish the following elements regarding the writing:

(i) that it is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with the intent to deceive.

*See Martin v. Bank of Germantown (In re Martin),* 761 F.2d 1163, 1166 (6th Cir. 1985).

## ANALYSIS

The parties do not dispute that the Defendants' Statement provided to the Plaintiff qualified as a "written statement" and that it contained material misstatements about the Defendants' financial condition. The parties also agreed that whatever the outcome of the trial is

for Mr. Springberg, it will also apply to Karen Springberg. During trial, the parties therefore focused on the conduct of Mr. Springberg as to the third and fourth elements—the Plaintiff's reasonable reliance on the Statement and whether the Defendants provided that statement with an intent to deceive the Plaintiff.

1.  Reasonable Reliance.

The third *Martin* element requires the plaintiff/creditor to establish reasonable reliance on the written statement.  Reasonable reliance is not defined in the Bankruptcy Code.  In the Sixth Circuit, whether a creditor's reliance was reasonable is a factual determination to be made in light of the totality of the circumstances.

> The Sixth Circuit has cited five factors to apply to determine reasonable reliance:
>
> (1) Whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*BankBoston Mortg. Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556, 1560 (6th Cir. 1992).

"The reasonableness requirement is not a rigorous one.  The creditor need establish only its reliance in fact, although its claims to reliance cannot be so unreasonable as to defeat a finding of reliance in fact."  *Bomis v. Nat. Union Fire Ins. Co.*, No. 93-1014, 1994 WL 201885 at *3 (6th Cir. 1994).  Although the requirement bars nondischargeability in any case where the creditors' asserted reliance was so unreasonable as to negate the existence of actual reliance, the true purpose of the requirement is to screen out creditors who knowingly solicit false financial statements to set up exceptions to dischargeability.  *Id.*

Applying the *Ledford* factors, neither the Defendants or Mr. Mann knew each other before the transaction, so the first two factors slightly favor the Defendants.  The debt was for

commercial purposes, where one would expect the Plaintiff to be more diligent.  The last two factors, however, require more analysis.

While Mr. Van Houzen testified that he saw at least three red flags, he has the advantage of 24 years of experience in reviewing financial statements.  Mr. Mann, while an attorney with considerable commercial experience, does not have this background.

As to the red flags, the lack of income is a question, but as testified by Mr. Springberg, he has not earned enough income to warrant paying taxes for years, ostensibly because of the timing of his real estate enterprises and because he has not drawn a salary from them.  This statement, from Mr. Springberg's perspective, is therefore correct.  On the other hand, Mr. Mann was not concerned about the income of the Defendants, but instead on their liquid assets and equity in property.  This is reasonable because Mr. Mann knew the source of payment was from the Hampton Inn, which he undoubtedly would know could or could not cash flow the loan.  While perhaps a red flag, the lack of income is not conclusive.

The second red flag is the failure to note the guarantor status of the Defendants.  Here, the Defendants require Mr. Mann to assume that every real estate developer or operator must have guaranteed the debt of entities.  While certainly this is the case in most instances, there is nothing in this record that this assumption is always true.  Incidentally, the method the Defendants chose to disclose their interests lulls one to assume that each entity had no debt.  For example, Mr. Springberg testified that he disclosed the value of AJJ to be $1,825,000, a net number resulting from a reduction of an approximately $2,600,000 debt from an appraised value of approximately $4,200,000.  The Statement does not indicate this methodology or suggest that any debt exists as to this property.  Likewise, the Defendants' interest in J&K Real Estate used the same method.  Again, with this record, there is little to suggest that Mr. Mann had reason to know of any debt against these properties, let alone that the Defendants guaranteed that debt.

What is not explained, however, is the inaccurate mathematical calculation of the Defendants' assets. Any analysis would show that the values simply do not add up as stated by the Defendants. Moreover, the difference in the amount is significant to warrant further investigation, which Mr. Mann did not do.

The life insurance flag is even more problematic, as it is unusual to have a cash surrender value greater than the face amount of the policy. While it appears this difference could be explained as a typographical error, it is still unclear how a life insurance policy would have a cash surrender value equal to or higher than the face amount given the facts in this case. Setting all of this aside, the lack of any inquiry is evidence that Mr. Mann gave only a cursory review of this asset, even though he testified that he considered the life insurance as important because it was a liquid asset, which he was concerned about because liquid assets were assets available to pay the loan.

Turning to the final *Ledford* element, minimal investigation would reveal the inaccuracies of the Defendants' statements. For example, had Mr. Mann noted the mathematical inaccuracies, he would have asked Mr. Springberg to explain the discrepancy. In turn, Mr. Springberg would have explained his methodology, which in turn would have uncovered the existence of guaranties or the valuation model used by Mr. Springberg. Likewise, any inquiry on the difference between cash surrender and face amount of the life insurance would show a much different picture of the Defendants' assets.

The Court has considered the reliance of Republic Bank on the Statement, and, in turn, the reliance of the Plaintiff on Republic Bank's analysis. The Court rejects the Plaintiff's reliance for two reasons. First, while the reasonableness requirement is not rigorous, it must mean something. To allow a party to request a financial statement and then not give any vigorous examination of that statement strikes the Court as insufficient for this element.

13

Otherwise, it would be sufficient for any time a creditor has to show that it looked at a statement and therefore met this element, even if the statement has numerous errors, as in this case.

Second, the facts of this case should have alerted the Plaintiff that more analysis was needed.  Republic Bank had declined to finance the transaction in full.   Clearly, the purchase price was too high, the hotel did not cash flow the loan amount, or the Defendants had insufficient assets or income to satisfy Republic Bank.  The Plaintiff knew that Republic Bank had declined the first loan, and was therefore on notice that its second position would not be completely secure.  With these facts and in this situation, the Court does not condone a second-hand reliance without more evidence.

Taken as a whole, there are too many inconsistencies in the Statement and laxness of investigation by Mr. Mann to find reasonable reliance. The red flags are simply too prevalent and worrisome to ignore.  A cursory review reveals mathematical inaccuracies, irregularities, and misstatements of fact.  The lack of any additional inquiry, coupled with the Plaintiff's rush to close, lead the Court to conclude that the Plaintiff did not reasonably rely on the Statement.

2.  Intent to Deceive.

The fourth element of Section 523(a)(2)(B) requires that the debtor make or publish the statement with "intent to deceive."

> The standard . . . is that if the debtor either intended to deceive the bank or acted with gross recklessness, full discharge will be denied. . . . That is, the debtor must have been under some duty to provide the creditor with his financial statement; but full discharge may be disallowed if the debtor either intended the statement to be false, or the statement was grossly reckless as to its truth.

*Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1166 (6th Cir. 1985) (citations omitted).

There is no evidence in this case that the Defendants intended to deceive the Plaintiff. Instead, the issue is whether the Defendants acted with gross recklessness.  The Court finds that

the Defendants did. First, Mr. Springberg testified that he delegated the completion of the Statement to Ms. Bowman. While this is a reasonable act, Mr. Springberg did little, if anything, to assist her, oversee her work, or check the Statement after she completed it. Per his testimony, he merely gave the Statement a cursorily glance before the Defendants each signed the Statement.

Second, Mr. Springberg testified that he had little, if any, appreciation of the importance of an accurate financial statement or why any financial institution or person lending money would find such a document important or useful. In particular, the Court noted the demeanor of Mr. Springberg during the trial and noted his total disregard of the purpose and use of a financial statement. As a result of observing Mr. Springberg's demeanor and hearing his testimony, the Court finds Mr. Springberg was cavalier about the preparation and handling of the financial statement, which is conclusive evidence of gross recklessness as described by the *Martin* Court.

Third, the nature of some of the items in the Statement evidence gross recklessness. For example, the failure to disclose appraisals on property or the ignoring of these appraisals to establish value on a more subjective basis shows that the Defendants did not care if the Statements were accurate. Additionally, while information about the value a co-owner places on a property is useful, a more formal approach is needed when a request to borrow millions of dollars is made.

Fourth, the lack of completeness shows the requisite gross recklessness. The debts owed to Mr. Rensberry are not disclosed anywhere in the Statement. The only disclosed debts the Defendants owed, either directly or indirectly, totaled $305,000, primarily to two creditors. These disclosures, without informing anyone of the other obligations that were simply subtracted from the value of the partnerships instead of specifically listed and accounted for, gave an incomplete and inaccurate statement of the Defendants' net worth and their ability to repay the

loan to the Plaintiff.  While the Court finds the Defendants' actions were not intentional, the actions were grossly reckless.

CONCLUSION AND ORDER

The Plaintiff has not proved reasonable reliance as required by 11 U.S.C. § 523(a)(2)(B) and *In re Martin*.  Accordingly, the debt owed by the Defendants to the Plaintiff is discharged.

NOW, THEREFORE, IT IS HEREBY ORDERED that the debt owed by the Defendants to the Plaintiff is discharged.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Opinion and Order After Trial pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Gregory M. Luyt and Michael O'Neal.

**Signed: September 5, 2014**



Hon. Daniel S. Opperman
United States Bankruptcy Judge